IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| RONALD A. DICUS and DIANE K. DICUS, husband and wife, and the marital community, | ) ) ) | No. 37533-1-III |
| | ) | |
| Appellants, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| ANTOINE TOHMEH, M.D., and "JANE DOE," husband and wife, and the marital community composed therof; | ) ) ) | |
| | ) | |
| Respondents | ) | |
| | ) | |
| ORTHOPAEDIC SPECIALTY CLIINC OF SPOKANE, a Washington business entity and health care provider; and DOES 1-5, | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

FEARING, J. — A jury ruled in favor of Dr. Antoine Tohmeh in a medical malpractice suit brought by Ronald Dicus. On appeal, Dicus claims procedural and instructional error. We disagree and affirm the superior court.

## FACTS

We gather the facts primarily from trial testimony. This case arises from two back surgeries Antoine Tohmeh, M.D. performed on Ronald Dicus in 2007.

Dr. Antoine Tohmeh provided Ronald Dicus continuing care from February 13, 2007 until July 12, 2012, for pain emanating from Dicus' spine.  On May 9 and 14, 2007, Dr. Tohmeh respectively performed two surgeries on Dicus' spine to fuse multiple levels of vertebrae.

The fusion surgeries included the insertion of metal screws in the vertebrae pedicles.  Pedicles are cylinder-shaped notches that project from the back of each vertebral body.  Each vertebra has two pedicles, one on each side.  Dr. Tohmeh placed one of the pedicle screws on the right side of the fifth lumbar vertebra (L5).  A surgeon inserts the screws through the pedicle into the vertebral body.  Dicus' spine had previously been fused between L5 and the first sacral vertebra (S1).  As a result, Dr. Tohmeh inserted the right L5 pedicle screw through an existent fusion mass.

Dr. Antoine Tohmeh performed outcome studies on his patients by periodically monitoring and obtaining information from them concerning recovery from surgery.  On May 3, 2008, one year after Ronald Dicus' surgeries, Dicus completed a questionnaire related to the surgeries.  On the form, Dicus indicated that he was "'very satisfied'" with his surgical outcome and that he "'definitely would'" elect to undergo the same surgeries given his current condition.  Report of Proceedings (RP) (Dec. 5, 2019) at 345.

Another year later, Ronald Dicus completed a May 26, 2009 questionnaire.  Dicus again reported he was "'very satisfied'" with the outcome of his procedures and that he likely would choose to have the same surgeries again.  RP (Dec. 5, 2019) at 345-46.

2

In May 2012, approximately five years after Ronald Dicus' surgeries, he visited Richard Bransford, M.D., a Seattle orthopedic surgeon. According to Dr. Bransford, Dicus reported right-sided lower extremity pain, traveling down the thigh, calf, and the top of his foot. During Dicus' initial visit to Dr. Bransford, Dicus remarked that he had not initiated a claim or lawsuit related to his symptoms, but that he actively interviewed attorneys and performed research. Dicus filed suit against Dr. Antoine Tohmeh in September 2013.

After Ronald Dicus' visit in May 2012 to Dr. Richard Bransford, Bransford next saw Dicus on October 3, 2015, two years after Dicus filed suit. At that time, Dicus complained of neck and right-sided arm pain. Dr. Bransford suspected the cause of Dicus' discomfort resulted from cervical myelopathy, an injury resulting from compression of the spinal cord. During the 2015 visit, Bransford did not address Dicus' lumbar and radicular symptoms in the lower right leg.

Ronald Dicus next visited with Dr. Richard Bransford in June 2016, nearly three years after filing suit. During this visit, Dicus reported ongoing, right-sided radicular pain stemming from L5. Dr. Bransford noted that Dicus suffered from foot drop. Foot drop occurs when the patient experiences inability to point his or her toes toward the body. Foot drop may be a symptom of spinal nerve compression. Bransford also reported increased kyphosis, or an excessive curvature of the spine resulting in abnormal rounding of the upper back.

On August 1, 2017, Dr. Richard Bransford performed surgery on Ronald Dicus' low back. During the procedure, Dr. Bransford removed the right L5 pedicle screw. In Bransford's postoperative report, he noted that the pedicle screw had toggled, meaning that it had moved millimeters from its original position. Dr. Bransford also noted bruising of the nearby nerve. After the August 2017 surgery, Dicus' preoperative right leg pain resolved. As to Dicus' improved condition, Dr. Bransford could not state with certainty what relieved Dicus' pain, but he noted that the pain could have resolved because of the removal of the L5 pedicle screw.

PROCEDURE

On September 26, 2013, Ronald Dicus filed suit against Dr. Antoine Tohmeh. In his complaint, Ronald Dicus alleged that, beginning on October 14, 2011 through or after May 14, 2012, he realized that a pedicle screw from the May 2007 surgeries had been incorrectly inserted or aligned in his lumbar spine. Dicus also alleged that Dr. Tohmeh failed to exercise the degree of care, skill, and learning expected of a reasonable physician at the time. Dicus maintained that Dr. Antoine's failure to properly secure the pedicle screw caused him physical injury and a loss of opportunity for a better outcome or a better recovery.

Ronald Dicus disclosed William DeLong, M.D., a neurosurgeon with experience in orthopedic surgery, as his expert to testify that Dr. Antoine Tohmeh violated the standard of care for a reasonably prudent orthopedic surgeon and, as a result, caused

injury to Dicus. According to Dr. DeLong, because Dicus experienced problems with a screw impinging on tissue other than bone, he should have returned to surgery to have the screw repositioned.

On April 26, 2017, Dr. Antoine Tohmeh's counsel deposed Dr. William DeLong. During the deposition, Dr. DeLong confirmed that Ronald Dicus' disclosure concerning the expert's opinions accurately stated his opinions. On May 2, 2017, the court reporter sent DeLong a transcript of his deposition for his review and any necessary changes. On May 22, 2017, DeLong provided a notarized certification of his deposition corrections and supplementation. The certification did not include reasons for the corrections.

Ronald Dicus' counsel deposed treating physician Dr. Richard Bransford on two occasions, October 4, 2017 and November 8, 2017, for a total of four hours. Before trial, Ronald Dicus moved to allow Dr. Richard Bransford to testify at trial by video teleconference. In an accompanying declaration, Dicus' counsel averred that Dr. Bransford's testimony would not relate to the standard of care, but rather solely address Dicus' treatment. Counsel declared that Dr. Bransford's packed surgery schedule, potential bad weather delaying his return trip, the plane fare, and the payment of $12,000 to $18,000 in professional fees all for approximately an hour's testimony justified remote testimony.

Dr. Antoine Tohmeh objected to Dr. Richard Bransford testifying by video teleconference. Dr. Tohmeh argued that Ronald Dicus did not demonstrate good cause in

compelling circumstances justifying the remote testimony. He further argued that Dicus

could have videotaped Dr. Bransford's testimony or subpoenaed him to testify live. In

reply, Dicus' counsel contended that the technology for transmitting Dr. Bransford's

testimony remotely existed in the courtroom and would be more cost-effective than

transporting the witness to testify live.

After entertaining argument in support of and in opposition to the motion for video

conferencing testimony, the superior court denied the motion. The court highlighted the

importance of live testimony. The court noted that remote transmission of testimony is

not justified simply because attending trial is inconvenient for the witness. Citing

comments from the 1996 advisory committee on Federal Rule 43(a), the court stated:

> "[T]he most persuasive showings of good cause and compelling
> circumstances are likely to arise when a witness is unable to attend trial for
> . . . *unexpected reasons*"—. . . "such that [sic] accident or illness, but
> remains able to testify from a different place. Other possible justification
> for remote transmission must be approached . . . *cautiously*." The
> committee goes onto [sic] write, "an unforeseen need for the testimony of a
> remote witness that arises during trial, however, may establish good cause
> and compelling circumstances. Justification is particularly likely if the
> need arises from the interjection of new issues during trial or from the
> unexpected inability to present testimony as planned from a different
> witness."

RP (Nov. 22, 2019) at 12-13. The court acknowledged Dr. Antoine Tohmeh's argument

that Dicus could have videotaped Dr. Bransford's deposition. The court found that Dr.

Bransford was both available to testify and subject to subpoena.

During trial, Ronald Dicus presented the testimony of expert, William DeLong, M.D. Dr. DeLong testified that, if a pedicle screw penetrates the spinal canal, which sits between the two pedicles, the screw may apply pressure on the nerve attached to the pedicle. According to DeLong, more than four millimeters of penetration of a pedicle screw into the spinal canal would cause nerve damage.

Dr. William DeLong, relying on imaging of Ronald Dicus' back, explained that the right L5 pedicle screw moved slightly toward the spinal canal. He opined that the screw sufficiently penetrated the canal to cause damage to the nerve root attached to the pedicle. Based on Dicus' symptoms, Dr. DeLong declared that the nerve root sustained damage when Dr. Antoine Tohmeh initially inserted the right L5 pedicle screw.

On direct examination of Dr. William DeLong, plaintiff's counsel asked the following:

> I want you to *assume* that Mr. Dicus will testify that when he woke up from surgery and he was asked to sit on the side of the bed, that he had extreme pain in his right leg and he couldn't lift up his right foot and move his right foot around, and this was within 12 hours of surgery. *In a circumstance such as that*, you assume that true, . . . what is expected to be done by a reasonably prudent physician in May of 2007?

RP (Dec. 4, 2019) at 185 (emphasis added). Dr. DeLong responded that obtaining an immediate CT scan would be the proper course of action to determine the pedicle screw's location. Dr. DeLong expressed concern that Dr. Antoine Tohmeh did not obtain a CT scan, even though he had evidence of a nerve root problem at L5. DeLong testified that

the right L5 pedicle screw should have been removed or repositioned within twenty-four hours. He opined that prompt removal of the pedicle screw would have at least partially relieved the pain Ronald Dicus experienced.

Dr. William DeLong averred that, because pedicle screws are foreign bodies, the human body attempts to separate the screws from scar tissue. Once the scar tissue forms, removal of the screw becomes riskier. Turning the screw could potentially twist the scar tissue, which in turn could damage the nerve. Dr. DeLong concluded that Dr. Antoine Tohmeh did not err when placing the right L5 pedicle screw, but instead failed to comply with the standard of care by not taking corrective, postoperative action.

During his trial testimony, Dr. William DeLong stated that he spoke with Ronald Dicus on the phone, prior to being deposed. During this conversation, Dicus divulged that he had an immediate onset of severe right leg pain and weakness. Dr. DeLong acknowledged the importance of Dicus' statement over the phone in formulating his expert opinions in this case.

After the completion of direct examination of Dr. William DeLong, after defense counsel had begun, but not finished, his cross-examination of Dr. DeLong, and after the trial had recessed for the night, plaintiff's counsel, the following morning, asked permission to reopen direct examination of Dr. DeLong. Plaintiff's counsel filed an offer of proof in support of the motion to reopen. She attached, to the offer, DeLong's forty-four-page correction and supplementation to his deposition testimony. The offer of proof

also attached medical records and imaging studies. Plaintiff's counsel sought to question Dr. DeLong as to the corrections to his deposition.

Defense counsel objected to reopening Dr. William DeLong's direct examination. Counsel argued that Ronald Dicus sought to introduce new statements under the guise of corrections and many of the supplementations were unnecessarily cumulative. Counsel also argued that the corrections did not comply with CR 30(e).

The superior court denied Ronald Dicus' request to reopen the direct examination of Dr. William DeLong. The court agreed with defense counsel that the correction and supplementation to Dr. DeLong's deposition was unnecessarily cumulative. The court noted that the case was on its fourth day of trial, but the first witness, Dr. DeLong, had yet to finish testifying. The court also worried about Dr. Antoine Tohmeh not knowing that new images were going to be offered via Dr. DeLong's supplementation, as they were never disclosed as exhibits within the case schedule order deadline.

During the continued cross-examination of Dr. William DeLong, defense counsel asked questions relating to the contemporaneous medical records of Dr. Antoine Tohmeh. According to the records, on May 15, 2007, the day after Ronald Dicus' second surgery, Dr. Tohmeh examined Dicus. Dr. DeLong acknowledged that, pursuant to Dr. Tohmeh's May 15 physical examination, Dicus' dorsiflexion and plantar flexion were intact, meaning that he could flex his right foot upward and downward. In other words, Dicus

9

should have had no evidence of foot drop. The May 15 note also indicated that Dicus experienced no leg pain.

Dr. William DeLong acknowledged, on cross-examination, that, according to the physician assistant's and nurse's notes for the three days following the second surgery, Ronald Dicus reported no right leg pain or weakness. The nurses repeatedly evaluated Dicus' motor strength in his right lower extremity in the days following the surgery. On May 15, a nurse graded Dicus' motor strength in his right lower extremity 4/5. Over the two subsequent days, Dicus' motor strength increased to 5/5, meaning his motor strength in his right lower extremity was normal. Dr. William DeLong admitted that the contemporaneous medical records following Ronald Dicus' 2007 operations conflicted with Dicus' statement to him that Dicus experienced an immediate onset of severe leg pain and weakness.

During trial, the superior court entered a written order denying Ronald Dicus' motion to allow Dr. Richard Bransford to testify by video teleconference. In the order, the court found that Dicus failed to establish good cause in compelling circumstances for contemporaneous transmission of testimony from a different location as required by CR 43(a)(1). As a result, Ronald Dicus' side read Dr. Bransford's deposition testimony to the jury.

No. 37533-1-III
*Dicus v. Tohmeh, M.D.*

The trial court's instructions to the jury included the standard Washington Pattern Instructions (WPI) on standard of care and burden of proof in a medical malpractice suit, as instructions 5 and 11, respectively. Jury instruction 5 provided, in its totality:

> A spinal surgeon owes to the patient a duty to comply with the *standard of care* for one of the profession or class to which he belongs.
> A spinal surgeon has a duty to *exercise the degree of skill, care, and learning expected of a reasonably prudent spinal surgeon* in the State of Washington acting in the same or similar circumstances at the time of the care or treatment in question.
> *Failure to exercise such skill, care, and learning constitutes a breach of the standard of care* and is negligence.

Clerk's Papers (CP) at 258 (emphasis added). Jury instruction 11 read, in relevant part:

> In connection with the plaintiff's claims of injury resulting from negligence, the plaintiff has the burden of proving each of the following propositions:
> First, that the defendant surgeon failed to follow the *applicable standard of care* and was therefore negligent.

CP at 264 (emphasis added).

On December 13, 2019, plaintiff's counsel submitted a trial brief arguing that jury instruction 11, which instruction used language from 6 *Washington Practice: Washington Pattern Jury Instructions: Civil* (WPI) 105.3 (7th ed. 2019), constituted an erroneous statement of law. Counsel submitted an alternative instruction containing language from 6 *Washington Practice: Washington Pattern Jury Instructions: Civil* 105.2 (7th ed. 2019). The proposed instruction omitted the phrase "applicable standard of care," and instead read that the plaintiff must prove that the defendant "failed to exercise the degree of care,

11

skill, and learning *expected* of a reasonably prudent spine surgeon and was therefore

negligent." CP at 203 (emphasis added). In her brief, plaintiff's counsel contended that

the "applicable standard of care" test was contrary to the legislative test for negligence as

outlined in RCW 7.70.040, which requires that the plaintiff demonstrate the health care

provider failed to "exercise that degree of care, skill, and learning expected of a

reasonably prudent health care provider." Appellant's Opening Br. at 35.

Ronald Dicus objected to jury instruction 11, repeating some of the arguments

contained in her brief. The trial court rejected Dicus' alternative jury instruction 11 and

provided the jury WPI 105.3.

The jury returned a verdict in Dr. Antoine Tohmeh's favor.

LAW AND ANALYSIS

On appeal, Ronald Dicus assigns error to three of the superior court's rulings: (1)

the order denying his motion to present the testimony of Dr. Richard Bransford by

videoconference, (2) the ruling denying him permission to reopen the direct examination

of Dr. William DeLong, and (3) the court delivering the standard instruction in

instruction 11, rather than Dicus' proposed instruction. We address these assignments in

such order.

Videoconference Testimony

Ronald Dicus contends that the trial court abused its discretion by not allowing his

treating physician, Dr. Richard Bransford, to testify by video teleconference. Dicus

highlights multiple factors when promoting this alleged error: (1) the doctor had a busy

surgery schedule in Seattle, (2) the superior court maintained the technology necessary to

broadcast Dr. Bransford's remote testimony by video, (3) the showing of a videotaped

deposition would deprive the jury the opportunity to ask Dr. Bransford questions, (4)

Dicus would have saved expenses by remote testimony, and (5) Dicus could have

conserved time by narrowing his live video questioning rather than reading the four-hour

deposition to the jury. Dr. Antoine Tohmeh responds that the trial court properly

exercised its discretion in refusing to allow Dr. Richard Bransford to testify by video

teleconference because Ronald Dicus failed to establish good cause in compelling

circumstances to justify contemporaneous testimony from a remote location.

This court reviews a trial court's decision whether to permit remote testimony for

abuse of discretion. *In re Marriage of Swaka*, 179 Wn. App. 549, 553, 319 P.3d 69

(2014). CR 43(a) governs the taking of testimony. The rule provides, in relevant part:

> (1) *Generally*. In all trials the testimony of witnesses shall be taken
> *orally in open court*, unless otherwise directed by the court or provided by
> rule or statute. *For good cause in compelling circumstances* and with
> appropriate safeguards, the court may permit testimony in open court by
> contemporaneous transmission from a different location.

(Some emphasis added.)

Federal Rule of Civil Procedure (FRCP) 43(a) contains identical language to

CR 43(a)(1). When a federal rule parallels a Washington State rule, this court may look

to analysis of the federal counterpart for guidance in interpreting the state rule.

No. 37533-1-III
*Dicus v. Tohmeh, M.D.*

*Washburn v. City of Federal Way*, 178 Wn.2d 732, 750, 310 P.3d 1275 (2013). FRCP

43(a) reads:

> At trial, the witness' testimony must be taken in open court unless a federal statute, the Federal Rules of Evidence, these rules, or other rules adopted by the Supreme Court provide otherwise. *For good cause in compelling circumstances* and with appropriate safeguards, the court may permit testimony in open court by contemporaneous transmission from a different location.

(Emphasis added.) The 1996 advisory committee notes interpreting FRCP 43(a)

emphasize the importance of live testimony:

> The importance of presenting live testimony in court cannot be forgotten. The very ceremony of trial and the presence of the factfinder may exert a powerful force for truthtelling. The opportunity to judge the demeanor of a witness face-to-face is accorded great value in our tradition.

The 1996 advisory committee notes state that "[t]ransmission cannot be justified merely

by showing that it is inconvenient for the witness to attend the trial." The notes also

address the types of circumstances which might establish good cause for

contemporaneous transmission:

> The most persuasive showings of good cause and compelling circumstances are likely to arise when *a witness is unable to attend trial for unexpected reasons, such as accident or illness*, but remains able to testify from a different place.
> . . . .
> Other possible justifications for remote transmission must be approached cautiously. . . . An *unforeseen need for the testimony of a remote witness that arises during trial*, however, may establish good cause and compelling circumstances. Justification is particularly likely if the need arises from the interjection of new issues during trial or from the

14

> unexpected inability to present testimony as planned from a different witness.
>
> . . . .
>
> *A party who could reasonably foresee the circumstances offered to justify transmission of testimony will have special difficulty in showing good cause and the compelling nature of the circumstances.*

FED. R. CIV. P. 43 advisory committee note to 1996 amendment (emphasis added).

The superior court denied the request for the remote video testimony of Dr. Richard Bransford because mere inconvenience did not justify remote testimony. No accident, illness, or unforeseeable circumstance prevented Dr. Richard Bransford from testifying in-person. Dicus does not cite authority holding that monetary and temporal savings outweigh the importance of live testimony. The circumstances Dicus proffered were reasonably foreseeable, including the cost of presenting Dr. Bransford's testimony and his busy medical practice. Ronald Dicus could have conducted a video preservation deposition in advance of the trial.

Long before trial, Ronald Dicus would have foreseen that the witness, a practicing surgeon, would be unavailable to testify in person. Knowing this, Dicus should have taken his expert's video deposition for use at trial. CR 32(a)(3). Thus, compelling circumstances did not justify a departure from in-court testimony. We conclude that the superior court did not abuse its discretion when denying the motion for remote testimony.

Reopening Testimony

Ronald Dicus argues that the trial court abused its discretion when it denied his request to reopen the direct examination of Dr. William DeLong to ask the expert questions relating to his correction and supplementation of his deposition testimony. Dicus contends that the exclusion of his expert's testimony constituted an erroneous discovery sanction.

Dr. Antoine Tohmeh responds that the trial court properly exercised its discretion by refusing to permit Ronald Dicus to reopen the testimony for three reasons. First, Dicus failed to satisfy the requirements of CR 30(e) when submitting the corrections page, because Dr. DeLong did not disclose the reason for his changes. Second, further questioning of Dr. DeLong about his corrections would have been unnecessarily cumulative. Third, Ronald Dicus had not disclosed before trial any new opinions based on the corrections. We agree with Antoine Tohmeh that the superior court did not abuse its discretion.

ER 611(a) authorizes the trial court to:

> exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) *avoid needless consumption of time*, and (3) protect witnesses from harassment or undue embarrassment.

(Emphasis added.) Under ER 611(a), the trial court determines whether to allow a party to reopen a witness' testimony. *State v. Williams*, 118 Wn. App. 178, 183, 73 P.3d 376

(2003). This court reviews the trial court's denial of a motion to reopen for an abuse of discretion. *State v. Williams*, 118 Wn. App. 178, 183 (2003). A trial court abuses its discretion when its decision is manifestly unreasonable, or is exercised on untenable grounds, or for untenable reasons. *State v. Blackwell*, 120 Wn.2d 822, 830, 845 P.2d 1017 (1993).

The superior court declined reopening of Dr. William DeLong's direct examination, in part, on the basis that the correction and supplementation to his deposition was unnecessarily cumulative. Ronald Dicus does not explain how Dr. DeLong's testimony concerning his deposition changes would have added new and helpful information for the jury.

CR 30(e) governs submission of deposition transcripts to witnesses and changes to deposition testimony. The rule provides, in relevant part:

> When the testimony is fully transcribed the deposition shall be submitted to the witness for examination and shall be read to or by the witness, unless such examination and reading are waived by the witness and by the parties. *Any changes in form or substance which the witness desires to make shall be entered upon the deposition by the officer with a statement of the reasons given by the witness for making them.* The deposition shall then be signed by the witness, unless the parties by stipulation waive the signing or the witness is ill or cannot be found or refuses to sign.

(Emphasis added.) Dr. William DeLong failed to follow this rule. This failure poses another reason to affirm the superior court's decision. This court may affirm the trial

17

court's decision on any ground supported by the record. *State v. Ellis*, 21 Wn. App. 123, 124, 584 P.2d 428 (1978).

Ronald Dicus complains that the superior court denied the reopening, in part, as a discovery sanction. He cites the rule that the superior court abuses its discretion to exclude testimony as a sanction absent any showing of intentional nondisclosure, willful violation of a court order, or other unconscionable conduct. *Rice v. Janovich*, 109 Wn.2d 48, 56, 742 P.2d 1230 (1987); *Fred Hutchinson Cancer Research Center v. Holman*, 107 Wn.2d 693, 706, 732 P.2d 974 (1987). We need not address this contention because other reasons support the superior court's exercise of discretion.

Jury Instruction 11

Ronald Dicus asserts that jury instruction 11 incorrectly stated the law as to his burden of proof in showing negligence of Dr. Antoine Tohmeh. He contends that the use of the phrase "applicable standard of care" in the court's instruction ran contrary to the legislative test for negligence as outlined in RCW 7.70.040. Dr. Antoine Tohmeh responds that the jury instruction 11 correctly stated the law.

Jury instructions suffice if evidence supports them, they allow each party to argue its theory of the case, and, when read as a whole, properly inform the trier of fact of the applicable law. *Fergen v. Sestero*, 182 Wn.2d 794, 803, 346 P.3d 708 (2015). Legal errors in jury instructions are reviewed de novo. *Fergen v. Sestero*, 182 Wn.2d 794, 803 (2015). A legally deficient error constitutes reversible error only if it prejudices a party.

18

*Fergen v. Sestero*, 182 Wn.2d at 803. The challenging party bears the burden of establishing prejudice. *Fergen v. Sestero*, 182 Wn.2d at 803. An instruction containing a clear misstatement of the law is presumably prejudicial and grounds for reversal unless the nonchallenging party can establish the error was harmless. *Fergen v. Sestero*, 182 Wn.2d at 803.

The superior court's jury instruction 11, based on WPI 6th 105.03, told the jury that plaintiff met its burden of showing negligence if "the defendant surgeon failed to follow the *applicable standard of care*." CP at 264 (emphasis added). Jury instruction 11 should be read together with the court's jury instruction 5. The latter instruction read:

> A spinal surgeon owes to the patient a duty to comply with the *standard of care* for one of the profession or class to which he belongs.
> A spinal surgeon has a duty to *exercise the degree of skill, care, and learning expected of a reasonably prudent spinal surgeon* in the State of Washington acting in the same or similar circumstances at the time of the care or treatment in question.
> *Failure to exercise such skill, care, and learning constitutes a breach of the standard of care* and is negligence.

CP at 258 (emphasis added).

Ronald Dicus objected to jury instruction 11 and instead proposed an instruction that read that the plaintiff must prove the defendant "failed to exercise the degree of care, skill, and learning *expected* of a reasonably prudent spine surgeon and was therefore negligent." CP at 203 (emphasis added). We find no fault with rejecting Dicus'

proposed language because jury instruction 5 encompassed that language and allowed

Dicus to forward his legal theory.

RCW 7.70.030 governs the plaintiff's burden of proof in a medical malpractice

suit. It requires that the plaintiff establish, among other things:

> (1) That the injury resulted from the failure of a health care provider to follow the *accepted standard of care*.

(Emphasis added.) RCW 7.70.040 outlines the necessary elements of proof in

establishing negligence in a medical malpractice suit. The statute declares, in relevant

part:

> (1) The following shall be necessary elements of proof that injury resulted from the failure of the health care provider to follow the accepted standard of care:
> (a) The health care provider *failed to exercise that degree of care, skill, and learning expected of a reasonably prudent health care provider* at that time in the profession or class to which he or she belongs, in the state of Washington, acting in the same or similar circumstances.

(Emphasis added.)

Ronald Dicus complains that RCW 7.70.040, when read in conjunction with

RCW 7.70.030, does not require a plaintiff in a medical malpractice suit to prove the

"applicable standard of care," as stated in jury instruction 11, but instead the "expected

standard of care." But the superior court placed this language in jury instruction 5. We

find no practical difference between the words "expected" and "applicable" in these

circumstances. The court's jury instruction 11 conformed to the Washington statutes.

20

No. 37533-1-III
*Dicus v. Tohmeh, M.D.*

CONCLUSION

We affirm the superior court's rulings and the verdict in favor of Dr. Antoine

Tohmeh.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Fearing, J.

WE CONCUR:

_____
Lawrence-Berrey, A.C.J.

21

No. 37533-1-III

STAAB, J. (concurring) — I agree that under the civil rule and circumstances that existed at the time, the trial court did not abuse its discretion in denying Ronald Dicus's motion to allow his treating physician to testify at trial by way of live video feed. I write separately to suggest that under more recent circumstances, the outcome might be different. I would also encourage the Rules Committee to consider amending this rule in light of technological advances, world events, and the goal of providing access to the courts.

In his motion for remote testimony, Mr. Dicus indicated that the cost to have a busy surgeon from Seattle travel to Spokane for one hour of in-person testimony would be prohibitive. This cost could be significantly mitigated by allowing the doctor to testify by way of live video. Dr. Antoine Tohmeh objected, arguing that Mr. Dicus's reasons for requesting remote testimony failed to provide a good cause for allowing remote testimony. The trial court agreed and denied Mr. Dicus's motion.

In affirming the trial court's decision, we keep in mind the timeline, rapidly changing technology, and world events. Mr. Dicus made his motion to allow for remote testimony in December 2019. At the time, remote appearance by live video feed was a novelty. Most courts did not have easy access to the technology for remote testimony,

and even if they did, they were uncomfortable with using it. For the most part, courts had not adopted procedures or local rules to address remote appearances.

A few months later the world changed and we were forced to consider alternatives as our new normal. Suddenly, "Zoom" became a household name and everyone learned how to appear by remote video. While the COVID-19 pandemic has been a tragedy in many ways, a silver lining has been our rapid acceptance and utilization of new technology. Remote appearances, while not perfect, have made the courts more accessible.

In light of the rapid advancement of technology and the increasing comfort level of the court and jurors with remote appearances, it is time to reconsider Civil Rule 43. Civil Rule 43 was first adopted 55 years ago in 1967. *See* CR 43. At that time, the internet was not an option. The only way for testimony to be provided remotely was through a telephone attached by a wire to the wall.

In 2010, the rule was amended to allow remote testimony "[f]or good cause in compelling circumstances and with appropriate safeguards." CR 43(a)(1). Even in 2010, the ability to provide a live video feed was relegated to the technologically advanced. The drafters of the 2010 amendment intended Washington courts to "seek guidance" from the federal rule. WASH. ST. REG. (WSR) 10-05-090 (Feb. 12, 2010). The Advisory Committee Note to Federal Rule of Civil Procedure 43 (FRCP) was adopted 26 years ago in 1996. FED. R. CIV. P. 43 Notes of Advisory Committee (1996). The Note preamble

emphasizes the importance of in-person testimony and the opportunity to judge the demeanor of a witness face-to-face. *Id.* For these reasons, "[t]ransmission cannot be justified merely by showing that it is inconvenient for the witness to attend the trial." *Id.* Dr. Tohmeh relied on this language in his objection to remote testimony.[1]

Dr. Tohmeh's objection to Mr. Dicus's motion for remote testimony is noteworthy not only for what it said, but also for what it did not say. In his objection, Dr. Tohmeh argued that the extreme costs and travel concerns raised by Mr. Dicus were merely inconveniences that did not overcome the presumption of in-person testimony. Dr. Tohmeh did not argue that having the witness testify by video would cause prejudice to his defense. Presumably it would give Dr. Tohmeh an advantage. *See Vazquez Diaz v. Commonwealth*, 487 Mass. 336, 359, 167 N.E.3d 822 (2021) ("multiple studies have indicated that witnesses who testify remotely may be viewed as less favorable, less credible, and less memorable than in-person witnesses."). Nor did Dr. Tohmeh argue that a video appearance was intrinsically problematic. Indeed, he suggested that Mr. Dicus should have utilized a video deposition of the witness so he could submit that previously recorded testimony at trial.[2]

---

[1] Ironically, after highlighting the importance of live testimony to deny remote testimony, the court then allowed Mr. Dicus to present the witness's testimony by transcript.

[2] Presumably a video deposition would be preferable over reading a transcript to the jury. But it is easy to understand why live testimony is preferable over a previously recorded video deposition. One obvious benefit to live testimony is the ability to answer questions that may have arisen since the deposition.

While the 1996 Advisory Committee Notes to FRCP 43 express that mere inconvenience to the witness is not a compelling reason for contemporaneous video testimony, courts are beginning to recognize that the rule's original purpose is losing its value in today's technology. *See* FED. R. CIV. P. 43 Notes of Advisory Committee (1996). The Ninth Circuit has held that geographical limitations constitute sufficient cause. *Beltran-Tirado v. Immigration Naturalization Servs.*, 213 F.3d 1179, 1186 (9th Cir. 2000). Due to the location of the hearing in California, the court found the "government had reason to arrange for telephonic testimony because [the witness] lived in Missouri." *Id.*

Similarly, the U.S. District Court for the District of Columbia granted a plaintiff's request for video testimony, finding that "no material difference" existed between live and video testimony, and in-court testimony and is much more convenient. *Fed. Trade Comm'n v. Swedish Match N. America, Inc.*, 197 F.R.D. 1, 2 (D.D.C. 2000). In reaching this conclusion, the court noted that the Committee Notes were generally "hostile" to concurrent video testimony for no apparent reason:

> I am mystified as to why anyone would think that forcing a person to travel across the continent is reasonable when his testimony can be secured by means which are a) equivalent to his presence in court and b) preferable to reading his deposition into evidence. To prefer live testimony over testimony by contemporaneous video transmission is to prefer irrationally one means of securing the witness's testimony which is exactly equal to the other.

*Id.* at 2.

4

Finally, it is important to consider CR 43 in light of the court's goal of providing access to justice. Mr. Dicus moved to have his witness testify remotely because of the high cost of having the witness testify in person. When his motion was denied, he made the hard choice of submitting the witness's testimony by transcript from an earlier deposition. Short of no testimony at all, this was one of the least desirable means of providing the evidence. Under Civil Rule 1, our rules should be "construed and administered to secure the just, speedy, and inexpensive determination of every action." CR 1. While I am not suggesting that cost savings should be one of our highest priorities when interpreting the rules, if we are sincere in our efforts to provide access to justice, it needs to be a factor when balancing competing concerns. Indeed, our Supreme Court encourages the use and adaptation of current technology to provide better access to the courts:

> The responsible use of technology is central to providing access to justice for all individuals. To that end, we should develop and utilize the technological tools that increase and enhance access to justice. These Principles do not mandate new expenditures, create new causes of action, or repeal or modify any rule. Rather they advocate that justice system decision makers carefully consider these Principles whenever technology is purchased, planned or implemented, to avoid reducing access, and, whenever possible, use technology to enhance access to justice.

ACCESS TO JUSTICE TECHNOLOGY PRINCIPLES pmbl.[3]

---

[3] *See* WASH. SUPREME COURT, ACCESS TO JUSTICE *TECHNOLOGY PRINCIPLES* (June 2020), https://www.courts.wa.gov/court_rules /?fa=court_rules.list&group=am&set=ATJ

Instead of using CR 43 as an impediment to the admission of relevant evidence, perhaps the presumption within the rule should be flipped on its head: that relevant evidence is admissible by live video unless prejudice is shown. In this way, concerns that are particularized can be raised and addressed on a case-by-case basis.[4] Since evidence is more likely to be considered credible when it is in-person, the proponent of video testimony would be able to balance the benefits and perils of video testimony and make a decision based on their resources and priorities.

Our technology is advancing faster than our court rules. While it is important to be cautious and careful in adopting new procedures, it is equally important to evolve so that the courts remain relevant and accessible as a venue for resolving civil disputes.

_____
Staab, J.

---

[4] For instance, there may be concerns about verifying a witness's identity or ensuring that the witness is not being unduly influenced by someone in the room. Some of these concerns can be solved by having the witness provide remote testimony with a notary public or officer of the court in the same room as the witness.